UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN ANDERSON, JR.,                )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )        Case No. 4:20 CV 908 ACL
                                   )
KILOLO KIJAKAZI,                   )
Acting Commissioner of Social Security )
Administration,[1]                 )
                                   )
        Defendant.                 )

**MEMORANDUM**

Plaintiff John Anderson, Jr., brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the Social Security Administration Commissioner's denial of his applications

for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and

Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Anderson's severe

impairments, he was not disabled as he had the residual functional capacity ("RFC") to perform

work existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with

consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is

presented in the parties' briefs and is repeated here only to the extent necessary.

---

[1]Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.   Pursuant
to Federal Rule of Appellate Procedure 43(c)(2), Kilolo Kijakazi is substituted for Andrew Saul
as defendant in this action.   No further action is needed for this action to continue.   *See* 42
U.S.C. § 405(g) (last sentence).

For the following reasons, the decision of the Commissioner will be affirmed.

## I.  Procedural History

On November 6, 2017, Anderson filed his applications for DIB and SSI benefits.   (Tr. 163, 165.)   He claimed that he became unable to work on January 1, 2013, due to degenerative disc disease, diabetes, depression, nerve pain, pain, and hypertension.   (Tr. 188.)   Anderson was 37 years of age at his alleged onset of disability date.   His applications were denied initially. (Tr. 85.)   Anderson's claims were denied by an ALJ on June 17, 2019.   (Tr. 11-21.)   In her opinion, the ALJ noted that Anderson had filed a prior application for benefits.   (Tr. 11, 52.) The ALJ stated that she was not reopening the prior decision, and explained that the decision at issue would only consider Anderson's eligibility for benefits since August 19, 2015—the date following the date his prior denial became final.   *Id.*   On May 28, 2020, the Appeals Council denied Anderson's claim for review.   (Tr. 1-5.)   Thus, the decision of the ALJ stands as the final decision of the Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Anderson argues that the ALJ "failed to properly evaluate RFC."   (Doc. 24 at 3.)

## II.  The ALJ's Determination

The ALJ first found that Anderson met the insured status requirements of the Social Security Act through December 31, 2017.   (Tr. 442.)   She stated that Anderson has not engaged in substantial gainful activity since August 19, 2015, the start of the period at issue.   *Id.*   In addition, the ALJ concluded that Anderson had the following severe impairments:   diabetes mellitus and degenerative disc disease. (Tr. 14.)   The ALJ found that Anderson did not have an impairment or combination of impairments that met or medically equaled the severity of one of

the listed impairments.   (Tr. 15.)

As to Anderson's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform sedentary work as defined in 20 CFR 404.1567(a) and
> 416.967(a), except: He should never climb ropes, ladders, or
> scaffolds, but can occasionally climb ramps and stairs, balance,
> stoop, kneel, crouch, and crawl.   He should have no concentrated
> exposure to vibration, unprotected heights, or hazardous
> machinery.

*Id.*

The ALJ found that Anderson was unable to perform past relevant work, but could

perform other jobs existing in significant numbers in the national economy, such as addresser,

document preparer, and information clerk.   (Tr. 19-20.)   The ALJ therefore concluded that

Anderson was not under a disability, as defined in the Social Security Act, from August 19,

2015, through the date of the decision.   (Tr. 20.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability
> insurance benefits protectively filed on November 6, 2017, the
> claimant is not disabled under sections 216(i) and 223(d) of the
> Social Security Act.

> Based on the application for supplemental security income
> protectively filed on November 6, 2017, the claimant is not
> disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 21.)

## III.   Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial

evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389,

401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less

than a preponderance of the evidence, but enough that a reasonable person would find it adequate

to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This

"substantial evidence test," however, is "more than a mere search of the record for evidence

supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir.

2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a

whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations

omitted).

To determine whether the Commissioner's decision is supported by substantial evidence

on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and
     non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's
     impairments.

6.   The testimony of vocational experts when required which is
     based upon a proper hypothetical question which sets forth the
     claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal

citations omitted).   The Court must also consider any evidence which fairly detracts from the

Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).   Put another way, a court should "disturb the ALJ's decision only if it falls outside the available zone of choice." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (citation omitted).

### III.B.   Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the

regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."   *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003).   "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."   *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."   20 C.F.R. § 416.921(b).   These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.   *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).   "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work."   *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.   If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.   20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d);

*see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.   20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).   "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations."   *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3).   The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id*.   If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.   *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience.   *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000).   The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.   *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004);

20 C.F.R. § 416.920(a)(4)(v).   If the claimant can make an adjustment to other work that exists

in significant numbers in the national economy, then the Commissioner will find the claimant is

not disabled.   If the claimant cannot make an adjustment to other work, then the Commissioner

will find that the claimant is disabled.   20 C.F.R. § 416.920(a)(4)(v).   At Step Five, even though

the burden of production shifts to the Commissioner, the burden of persuasion to prove disability

remains on the claimant.   *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms,

findings, functional limitations, and effects of treatment" in the case record to assist in the

determination of whether a mental impairment exists.   *See* 20 C.F.R. §§ 404.1520a(b)(1),

416.920a(b)(1).   If it is determined that a mental impairment exists, the Commissioner must

indicate whether medical findings "especially relevant to the ability to work are present or

absent."   20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).   The Commissioner must then rate the

degree of functional loss resulting from the impairments.   *See* 20 C.F.R. §§ 404.1520a(b)(3),

416.920a(b)(3).   Functional loss is rated on a scale that ranges from no limitation to a level of

severity which is incompatible with the ability to perform work-related activities.   *See id.*   Next,

the Commissioner must determine the severity of the impairment based on those ratings.   *See* 20

C.F.R. §§ 404.1520a(c), 416.920a(c).   If the impairment is severe, the Commissioner must

determine if it meets or equals a listed mental disorder.   *See* 20 C.F.R. §§ 404.1520a(c)(2),

416.920a(c)(2).   This is completed by comparing the presence of medical findings and the rating

of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental

disorders.   *See id.*   If there is a severe impairment, but the impairment does not meet or equal the

listings, then the Commissioner must prepare an RFC assessment.   *See* 20 C.F.R. §§

404.1520a(c)(3), 416.920a(c)(3).

## IV.   Discussion

Anderson challenges the ALJ's RFC determination.   He also argues that the ALJ erred in evaluating the credibility of Anderson's subjective complaints and in evaluating the medical opinion evidence.   The undersigned will address these claims in turn, beginning with the ALJ's assessment of Anderson's subjective complaints.

### 1.  Consistency of Subjective Complaints[2]

A claimant's RFC is the most he can do despite his physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).   The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.   *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a).   Accordingly, when determining a claimant's RFC, the ALJ must evaluate the consistency of the claimant's subjective statements of symptoms with the evidence of record.   *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).

---

[2]In 2017, the Social Security Administration issued a new ruling that eliminated the use of the term "credibility" when evaluating a claimant's subjective statements of symptoms, clarifying that "subjective symptom evaluation is not an examination of an individual's character."   SSR 16-3p, 2017 WL 5180304, at *2 (Soc. Sec. Admin. Oct. 25, 2017) (republished).   The factors to be considered in evaluating a claimant's statements, however, remain the same.   *See id*. at *13 ("Our regulations on evaluating symptoms are unchanged.").   *See also* 20 C.F.R. §§ 404.1529, 416.929.   This new ruling applies to the Commissioner's final decisions made on or after March 28, 2016.

For purposes of social security analysis, a "symptom" is an individual's own description or statement of his physical or mental impairment(s).   SSR 16-3p, 2017 WL 5180304, at *2 (Soc. Sec. Admin. Oct. 25, 2017) (republished).   If a claimant makes statements about the intensity, persistence, and limiting effects of his symptoms, the ALJ must determine whether the statements are consistent with the medical and other evidence of record.   *Id.* at *8.

When evaluating a claimant's subjective statements about symptoms, the ALJ must consider all evidence relating thereto, including what are familiarly known as "the *Polaski* factors," that is, the claimant's prior work record; daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions.   *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted); *see also* 20 C.F.R. §§ 404.1529, 416.929.   If the ALJ finds that the statements are inconsistent with the evidence of record, she must make an express determination and detail specific reasons for the weight given the claimant's testimony.   SSR 16-3p, 2017 WL 5180304, at *10; *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991).   While an ALJ must acknowledge and consider the *Polaski* factors, she need not discuss each one before discounting a claimant's subjective statements.   *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010).

Here, after finding at Step 3 of the sequential analysis that Anderson's impairments did not meet the criteria for listing-level disability, the ALJ evaluated Anderson's statements of pain and symptoms and assessed his RFC.   The ALJ properly cited and considered the *Polaski* factors and made specific findings that Anderson's claimed symptoms were inconsistent with the record.   Because these findings are supported by substantial evidence on the record as a whole,

the undersigned must defer to the ALJ's determination.   *Julin v. Colvin*, 826 F.3d 1082, 1086

(8th Cir. 2016).

The ALJ summarized Anderson's testimony regarding his pain and limitations

due to his physical[3] impairments as follows:

> In his Function Report, he alleged that he had days he was unable to move due to
> stiffness and pain.   He claimed to be unable to walk for more than 15 minutes
> and has trouble standing or sitting for any period of time.   He stated that he was
> able to lift five pounds.   He reported that he was able to walk a few hundred feet
> before he needs to rest for five to ten minutes.   He claimed that he uses a brace or
> splint.
>
> At the hearing, he testified to degenerative disc disease in the lower back with
> tingling down his left leg to his feet.   He reported that he could stand for fifteen
> to twenty minutes and sit for thirty to forty-five minutes.   He claimed he was
> unable to carry more than fifteen to twenty pounds.   He testified to being able to
> mow his yard for forty-five minutes with breaks every ten minutes.   He claimed
> that he was referred to physical therapy, but was unable to afford it, and had not
> been referred to a neurosurgeon.

(Tr. 16.)

The ALJ first stated that the medical records do not substantiate Anderson's subjective

complaints.   *Id.*   The ALJ conducted a detailed review of the objective medical evidence, which

is summarized below.

The ALJ stated that Anderson reported no back or joint pain when he saw John Vernon,

M.D., on August 24, 2016, for treatment of a cyst on his scrotum.   (Tr. 16, 390-91.)   Dr.

Vernon referred Anderson to a urologist for excision.   (Tr. 393.)   Anderson called Dr. Vernon's

office the next day requesting narcotic pain medication for pain in his scrotum.   (Tr. 390.)   Dr.

Vernon next saw Anderson on October 18, 2016, for follow-up after being hospitalized for

---

[3]Although the ALJ found Anderson also suffered from non-severe mental impairments,
Anderson does not challenge the ALJ's findings regarding his mental impairments.   As such, the
undersigned's discussion will be limited to Anderson's physical impairments, particularly his
musculoskeletal impairments.

alcoholic pancreatitis.   (Tr. 16, 387.)   Anderson was having "some issues still" with pain in his lower back and reported his sugars were running high since he was discharged on October 9, 2016.   *Id.*   Anderson's physical examination was normal, other than abnormal monofilament testing in his feet.   (Tr. 17, 388.)   Dr. Vernon counseled Anderson on lowering his blood sugar levels.   (Tr. 389.)   Anderson returned to Dr. Vernon on November 29, 2016, for follow-up regarding his diabetes.   (Tr. 17, 384.)   He reported his blood sugar levels had been better, although they ran higher the previous week.   *Id.*   Anderson reported that he was "still having trouble" with low back pain.   *Id.*

On April 10, 2017, Anderson presented to Barnes-Jewish Hospital with complaints of oral pain.   (Tr. 17, 295.)   He was diagnosed with an abscess, and the tooth was extracted.   (Tr. 17, 306.)   Anderson returned to the hospital three days later requesting pain medication for facial pressure and pain.   (Tr. 17, 314.)   He reported no other complaints, and his examination was normal.   (Tr. 17, 314, 386.)

Anderson received diabetes education and medication from Volunteers in Medicine from June 2017 through October 2017.   (Tr. 17, 336-42.)

Anderson saw Dr. Vernon for follow-up on July 6, 2017, at which time he reported low back pain and pain in the left hip that went down his leg, but no numbness.   (Tr. 17, 381.)   On examination, Anderson appeared to be in mild to moderate pain, had an antalgic gait, exhibited no tenderness in the lumbosacral spine, had reduced left sided range of motion, positive straight leg raise test, and normal motor strength and sensation.   (Tr. 17, 382.)   Dr. Vernon diagnosed Anderson with acute left-sided low back pain with sciatica.   (Tr. 382.)   He prescribed steroids

and Norco,[4] and counseled Anderson extensively about discontinuing tobacco use.   (Tr. 382-83.)

Anderson returned to Barnes-Jewish Hospital on July 19, 2017, with complaints of left hip and low back pain; and radiating pain to the left leg, with some numbness beyond his typical diabetic numbness.   (Tr. 17, 318.)   The symptoms started one to two months prior and had worsened.   *Id.*   The examining physician noted pain on palpation of the left sciatic notch area and the left sacral area; positive straight leg raise with radicular pain; and full rotation in the hip. (Tr. 17, 321.)   Anderson underwent x-rays of the hip, which were normal.   (Tr. 17, 325.)   He also underwent a CT scan of the lumbar spine, which revealed marked degenerative disc disease at L4-L5 and L5-S1, without significant central or neural foraminal narrowing.   (Tr. 17, 333.)

Anderson saw Dr. Vernon for a follow-up on July 31, 2017, at which time he reported his back pain was a "little better."   (Tr. 17, 377.)   Upon examination, Dr. Vernon noted only a "small amount of tenderness" in the left lower back.   (Tr. 378.)   Dr. Vernon diagnosed Anderson with lumbar disc degeneration, and recommended physical therapy.   (Tr. 17, 379.) He also refilled Anderson's pain medication prescriptions and started him on Gabapentin.[5]   (Tr. 379.)   On September 11, 2017, Anderson returned for follow-up.   (Tr. 17, 374.)   He reported that he still experienced back pain, and that he had seen a chiropractor.   *Id.*   Dr. Vernon noted no abnormalities on examination.   (Tr. 376.)   He increased Anderson's dosage of Gabapentin and continued his other medications.   *Id.*

---

[4]Norco contains a combination of narcotic (hydrocodone) and non-narcotic (acetaminophen) analgesics and is indicated for moderate to severe pain.   *See* WebMD, http://www.webmd.com/drugs (last visited October 28, 2021).

[5]Gabapentin is an anti-epileptic drug indicated for the treatment of seizures as well as bipolar disorder.   *See* WebMD, http://www.webmd.com/drugs (last visited October 28, 2021).

Anderson received chiropractic treatment from Kristin Gaines-Porter, D.C., from August through September of 2017. (Tr. 18, 346-68.)   Dr. Gaines-Porter noted areas of spasm, hypomobility, and tenderness in the lumbar and thoracic spine. (Tr. 18, 355, 357, 359, 361, 363, 365, 367.)   On September 12, 2017, Anderson reported an aggravation of symptoms after roofing and mowing the lawn. (Tr. 18, 361.)   On September 18, 2017, Anderson reported that his low back pain was aggravated over the weekend after mowing the lawn. (Tr. 18, 365.)   He had not taken his pain medication that morning and rated his pain as a 3 on a scale of 1 to 10. (Tr. 365.)   He rated his pain between a 3 and 6 at each visit (Tr. 355, 357, 359, 361, 363, 365), except on September 25, 2017, at which time he rated his pain as a 7 when he had run out of pain medication (Tr. 367).

Anderson saw Dr. Vernon on October 3, 2017, for follow-up. (Tr. 18, 371.)   Anderson reported that his chiropractic treatment helped for about one day. *Id.*   He complained of left leg weakness and reported his left leg has given out on him a couple times. *Id.*   On examination, Dr. Vernon found Anderson's gait was normal, he had no edema, and his reflexes were normal. (Tr. 18, 373.)   Dr. Vernon continued Anderson's medications and referred him to a pain management physician. (Tr. 373)   On December 11, 2017, Anderson complained of sinus symptoms. (Tr. 18, 406.)   He reported his back was still bothering him, but he did not have insurance and could not afford pain management. (Tr. 406.)   Dr. Vernon continued Anderson's medications. (Tr. 408.)   Anderson saw Dr. Vernon for a follow-up regarding his diabetes on March 1, 2018, at which time he reported he had been doing better. (Tr. 419.)   Anderson returned for follow-up on June 4, 2018, at which time he complained of congestion. (Tr. 433.)

He also requested an increase in his dosage of Percocet,[6] noting that it was not helping his back pain as much as it had been previously.   (Tr. 18, 433.)   Dr. Vernon told Anderson that he did not think it was a good idea to increase his pain medications.   (Tr. 18, 437.)   He instructed Anderson to exercise and continue taking his existing pain medications.   *Id.*   At his next follow-up visit on October 1, 2018, Dr. Vernon refilled Anderson's medications.   (Tr. 462.)   On January 3, 2019, Anderson reported that his back pain was about the same.   (Tr. 468.)   Dr. Vernon noted Anderson had no edema on exam, and his sensory exam was normal.   (Tr. 470.) He found no abnormalities, other than some depression.   *Id.*

Anderson argues that the ALJ erred in finding the medical evidence was not supportive of his subjective complaints because the 2017 CT scan findings and positive straight leg raise tests support his allegations of disabling pain.   The ALJ, however, acknowledged that July 2017 imaging revealed marked degenerative disk disease at L4-5 and L5-S1, and that straight leg raise testing in July 2017 was positive.   (Tr. 17.)   Despite these findings, the majority of physical examinations during the relevant four-year period were normal.   For example, Anderson had no pain complaints on some visits, he had normal examination findings on many occasions, and he typically had a normal gait.   Additionally, the ALJ pointed out that Anderson was never examined by a surgeon, never received injections, and has not been prescribed a brace.   (Tr. 19.) As such, the ALJ did not err in finding that the overall medical evidence was not consistent with the presence of disabling physical impairments.   An ALJ may not disregard subjective allegations solely because they are not fully supported by objective medical evidence, but may afford them less weight if inconsistencies exist in the record as a whole.   *Renstrom*, 680 F.3d at

---

[6]Percocet is a combination of opioid and non-opioid pain reliever indicated for the treatment of moderate to severe pain.   *See* WebMD, http://www.webmd.com/drugs (last visited October 28, 2021).

1066.   An ALJ is "entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."   *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002) (citing 20 C.F.R. §§ 404.1529(c) & 416.929(c)).

The ALJ stated that, although Anderson reported he was unable to attend prescribed physical therapy, he was able to afford to see a chiropractor.   Anderson further testified that he did not apply for Medicaid.   (Tr. 38, 231.)   An ALJ may properly consider a plaintiff's failure to comply with suggested treatment when assessing credibility.   *See Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006).

The ALJ also noted instances in the medical records of Anderson's narcotic-seeking behavior.   For example, in an August 30, 2017 treatment note, a provider at Volunteers in Medicine indicated Anderson was "getting high doses of Oxycodone from another doctor," and that he was told he could not keep getting prescriptions from another doctor and Volunteers in Medicine.   (Tr. 17, 339.)   Anderson was directed to make another appointment with a doctor to discuss this issue.   *Id.*   Anderson testified that he did not return to Volunteers in Medicine for an examination since, because they would not prescribe him "the good pain pills."   (Tr. 39.)   In June 2018, Dr. Vernon declined Anderson's request to increase his dosage of pain medications, remarking that this was not "a good idea."   (Tr. 18, 437.)   Instead, Dr. Vernon continued Anderson's medications and instructed him to continue exercising.   (Tr. 437.)   A claimant's misuse of medications is a valid factor in an ALJ's credibility determination.   *Anderson v. Shalala*, 51 F.3d 777, 780 (8th Cir. 1985) (claimant's "drug-seeking behavior further discredits her allegations of disabling pain"); *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003) (claimant's misuse of medications is a valid factor in ALJ's credibility determination).

Finally, the ALJ noted instances of daily activities that were inconsistent with Anderson's allegations of disability.   For example, on September 12, 2017, Anderson reported to chiropractor Dr. Gaines-Porter that his symptoms were aggravated after roofing and mowing the lawn.  (Tr. 18, 361.)   The following week, Anderson again reported increased low back pain after mowing the lawn.  (Tr. 18, 365.)   Additionally, Anderson reported that he goes out alone, drives a car, shops for groceries, makes simple meals, performs basic housework, takes care of his children, and attends his children's sporting events.   (Tr. 14, 222-32.)   Anderson's activities during the relevant period—particularly his ability to care for children, mow the lawn, and roof—can be seen as inconsistent with his subjective complaints of extreme symptoms, and they may be considered alongside other factors in assessing the severity of his subjective complaints. *Wagner*, 499 F.3d at 852-53 (finding claimant's accounts of "extensive daily activities, such as fixing meals, doing housework, shopping for groceries, and visiting friends" supported the ALJ's conclusion that his complaints were not fully credible); *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (finding that in assessing a claimant's credibility, the ALJ properly considered the fact that the claimant took care of her eleven-year-old child, drove her to school and did other driving, fixed simple meals, did housework, shopped for groceries, and had no difficulty handling money).

In sum, the ALJ thoroughly reviewed Anderson's testimony and other evidence of record and in a manner consistent with *Polaski*, articulated specific reasons to find his symptoms and limitations were inconsistent with the record.   Because this determination is supported by good reasons and substantial evidence on the record as a whole, the undersigned must defer to it. *Julin*, 826 F.3d at 1086.

### 2. Opinion Evidence and RFC

Anderson next argues that the ALJ erred in evaluating the opinion evidence when determining Anderson's RFC.   Specifically, Anderson contends that the ALJ failed to provide good reasons for discrediting Dr. Vernon's opinions.   He also argues that the ALJ erred in relying on the opinion of a non-examining physician.

It is the ALJ's responsibility to determine a claimant's RFC by evaluating all medical and non-medical evidence of record.   20 C.F.R. §§ 404.1545, 404.1546, 416.945, 416.946.   Some medical evidence must support the ALJ's RFC finding, but there is no requirement that the evidence take the form of a specific medical opinion from a claimant's physician.   *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).   "The determination of a claimant's RFC during an administrative hearing is the ALJ's sole responsibility and is distinct from a medical source's opinion."   *Wallenbrock v. Saul*, No. 4:20-CV-00182-SRC, 2021 WL 1143908, at *6 (E.D. Mo. Mar. 25, 2021) (citing *Kamann v. Colvin*, 721 F.3d 945, 950-51 (8th Cir. 2013)). Additionally, when determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints.   *Wagner*, 499 F.3d at 851; *Tellez*, 403 F.3d at 957.

The ALJ determined that Anderson was capable of performing sedentary work, with additional limitations of never climbing ladders, ropes and scaffolds; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and he should have no concentrated exposure to vibration, unprotected heights, or hazardous machinery.   (Tr. 15.)   In making this determination, the ALJ evaluated the medical opinion evidence.

A "medical opinion" is a statement from a medical source about what an individual can still do despite his impairments, and includes limitations or restrictions about the ability to

perform physical, mental, sensory, and/or environmental demands of work.   20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).   Under the revised Social Security regulations,[7] the agency "[w]ill not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."   20 C.F.R. §§ 404.1520c(a), 416.920c(b)(2).   Instead, the ALJ must assess the persuasiveness of all medical opinions and prior administrative medical findings using a number of factors, including: 1) the supportability of the opinion with objective medical evidence and explanations; 2) the consistency of the opinion with evidence from other medical and nonmedical sources; 3) the relationship of the provider to the claimant, including the length, nature and frequency of treatment; 4) the specialization of the provider; and 5) other factors, including the source's familiarity with the Social Security guidelines.   *See* 20 C.F.R. § 404.1520c.   The ALJ must explain how they considered the factors of supportability and consistency in their decisions but are not statutorily required to discuss the other factors.   20 C.F.R. § 404.1520c(b)(2).

Treating physician Dr. Vernon completed a questionnaire on October 22, 2017.   (Tr. 482-83.)   Dr. Vernon indicated that he had been seeing Anderson every two to three months for four to five years for diagnoses of lumbar disc degeneration at L4/L5 and L5/S1 and diabetes. (Tr. 482.)   He identified Anderson's symptoms as pain and numbness or tingling.   *Id.*   Dr. Vernon expressed the opinion that Anderson could sit for a total of four hours in an eight-hour workday, stand or walk a total of two hours, would require periods of walking around and shifting at will, and would require unscheduled breaks during the workday; could constantly lift

---

[7]The new regulations are applicable to Anderson's claims because he filed his appeal after March 27, 2017.   *See* 20 C.F.R. §§ 404.1520c, 416.920c.

up to ten pounds, frequently lift twenty pounds, and occasionally lift fifty pounds; could frequently reach in all directions, handle, finger, and feel; and could occasionally twist, stoop, crouch, and climb ladders and stairs.   (Tr. 482-83.)   Dr. Vernon found that Anderson's pain would constantly interfere with his attention and concentration and that he would have difficulty working a full-time job on a sustained basis due to chronic pain.   (Tr. 483.)   He also found that Anderson would be off task more than twenty percent of the workday and would be absent from work about three times a month.   *Id.*

The ALJ indicated that she had considered Dr. Vernon's opinion and found it "unpersuasive."   (Tr. 18.)   She explained that Dr. Vernon's opinion was "internally inconsistent," citing the contrast between Dr. Vernon's lifting restrictions and his other limitations.   Specifically, Dr. Vernon found that Anderson was capable of constantly lifting ten pounds, frequently lifting twenty pounds, and occasionally lifting fifty pounds.   These lifting limitations are consistent with the performance of medium work.   *See* 20 C.F.R. § 404.1567(c). Yet Dr. Vernon also found that Anderson could only stand two hours during an eight-hour workday, sit four hours, would be off task more than twenty percent of the time and would miss three days of work monthly due to his chronic pain—limitations inconsistent with even sedentary work.   The ALJ reasonably determined that the lifting limits found by Dr. Vernon appear inconsistent with the other extreme limitations found by Dr. Vernon.

The ALJ also found that Dr. Vernon's opinion was inconsistent with his treatment notes, which indicate that he was attempting to decrease the claimant's pain medications.   (Tr. 19.) As previously noted, Dr. Vernon declined Anderson's request to increase his dosage of narcotic medication in June 2018, noting he did not think it was a "good idea", and directed Anderson to continue exercising.   (Tr. 437.)   In January 2019, Dr. Vernon indicated that he would "try to

wean [Anderson's] meds a bit."   (Tr. 472.)   As such, the ALJ's finding is supported by the record.

Additionally, neither Dr. Vernon's records nor those of other providers consistently noted any significant abnormalities on examination.   In August and September of 2017, Anderson reported pain levels of between three to six to his chiropractor, with increased pain reported only after mowing the lawn or roofing.   (Tr. 19.)   The ALJ noted that Dr. Vernon's opinion, provided the following month, is not consistent with Anderson's reports to his chiropractor.   (Tr. 19.)   Thus, the ALJ did not err in evaluating Dr. Vernon's opinion.

The ALJ next addressed the opinion of non-examining state agency consultant Joann Mace, M.D.   (Tr. 18.)   On December 18, 2017, Dr. Mace expressed the opinion that Anderson could frequently lift and carry ten pounds; stand or walk for a total of two hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; push and pull an unlimited amount; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to vibration and hazards.   (Tr. 61-62.)

The ALJ stated that she had considered Dr. Mace's opinion and found it "persuasive." (Tr. 18.)   The ALJ explained that Dr. Mace's opinion that Anderson was capable of sedentary work with postural and environmental limitations was "consistent and well supported by the records [ ] she reviewed."   *Id.*

Anderson argues that the ALJ erred in relying on Dr. Mace's opinion, as Dr. Mace did not examine Anderson.   He further argues that Dr. Mace did not answer the questions of whether Anderson needed to take unscheduled breaks or whether he would be off task, which

were addressed only by Dr. Vernon.   Anderson contends that the ALJ's failure to ask Dr. Mace these questions prevented the ALJ from relying on Dr. Mace's opinion.

The undersigned finds that the ALJ conducted a proper assessment of Dr. Mace's opinion.   Dr. Mace, as a state agency physician, is an expert qualified to provide opinions on a claimant's functional limitations based on a review of the record.   *See* 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1) (2017) (noting that state agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation).

Dr. Mace reviewed and summarized the treatment notes of Dr. Vernon, emergency room records, records from Volunteers in Medicine, and chiropractic records in her narrative report. (Tr. 62-63.)   She concluded that, although Anderson suffered from degenerative disc disease, his "gait has usually been noted as normal and there is no evidence of central canal or foraminal stenosis that would merit a finding of less than sedentary…"   (Tr. 63.)   If Dr. Mace believed Anderson had additional restrictions, including the need for unscheduled breaks or a significant amount of time spent off task, she had the opportunity to provide this information in the narrative section of her report.   It is clear from her summary of the medical evidence that she did not believe additional limitations were merited.   Under these circumstances, the ALJ had no duty to inquire of Dr. Mace about additional restrictions.

Further, the ALJ did not rely solely on Dr. Mace's opinion when determining Anderson's RFC.   Instead, she considered all of the medical and non-medical evidence of record when making her determination.   To the extent Anderson suggests that his RFC should have been determined or confirmed by a medical source, Anderson is mistaken.   As stated above, it is the ALJ's role to evaluate the record in its entirety, including medical opinions and testimony, and

formulate a claimant's RFC based on all the relevant, credible evidence of record.   *See Perks*, 687 F.3d at 1092.

The Court finds that the evidence relied upon by the ALJ constitutes substantial evidence, including medical evidence, to support the RFC assessment.   Regarding Anderson's musculoskeletal impairments, the ALJ considered the objective medical evidence, including the results of imaging and other testing, and findings on examination.   She also properly considered the opinions of Drs. Vernon and Mace.   The ALJ's determination that Anderson was capable of performing a limited range of sedentary work is supported by Dr. Mace's opinions.   The ALJ's determination is consistent with Anderson's daily activities, including his ability to take care of his children, mow his lawn, and roof during the relevant period.   Anderson has failed to demonstrate that the ALJ's decision was outside the available "zone of choice."

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of December, 2021.